IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00371-RMR-NRN

SPICE MERCHANTS ENTITIES CORP., a Michigan corporation,
STM Properties, LLC, a Michigan limited liability company, and
LISA FREEMAN, a Michigan individual,

Plaintiffs,

v.

PRETTY COLORADO, LLC, a Colorado limited liability company,
CORINNE WINSLOW, a Colorado individual, and
ELLIS YOUNG (USA), LTD, a Colorado limited liability company,

Defendants.

---

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
**(ECF No. 8)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

## I.    PROCEDURAL BACKGROUND

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction, filed February 22, 2024. ECF No. 8. The Parties consented Magistrate Judge jurisdiction on May 3, 2024. ECF No. 28. Judge Regina M. Rodriguez issued an order of reference pursuant to 28 U.S.C. § 636(c) on May 6, 2024. ECF No. 29.

On May 8, 2024, the Court set a scheduling conference and an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction for May 28, 2024. ECF No. 30. The Court held the first of three days of evidentiary hearings on the motion on May 28, 2024. *See* ECF No. 45 (Courtroom Minutes). A second day of evidence was presented on June 7, 2024. *See* ECF No. 52 (Courtroom Minutes). The presentation of evidence

concluded on June 14, 2024, followed by closing arguments. *See* ECF No. 54 (Courtroom Minutes). Perhaps preoccupied by the lengthy evidentiary presentations, the Court never got around to having a formal scheduling conference and no scheduling order has yet been entered in this case.

At the conclusion of the preliminary injunction proceedings, the matter was referred to Chief Magistrate Judge Michael E. Hegarty for settlement. The Court has been informed that those negotiations failed to bear fruit, thereby necessitating a decision on Plaintiff's Motion for Preliminary Injunction.

Over the course of preliminary injunction presentations, the Court heard from the following seven witnesses: Michael Carl, Theo Foote, Plaintiff Lisa Freeman, Ja-Lene Postema, Sue Kelly, Trevor Ellis (principal of Defendant Trevor Young), and Defendant Corinne Winslow. Dozens of exhibits were entered into evidence. More than 12 hours of court time was devoted to hearing evidence and argument. All Parties had a fair chance to present their respective positions.

Based on the Court's hearing and weighing of the testimony, its review of the exhibits entered into evidence, and consideration of the authorities presented, Plaintiff's Motion for Preliminary Injunction will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the request for return of materials (including operating manuals and recipe books) will be **GRANTED**. The request to enforce the non-compete provisions of the franchise agreement, and for the Plaintiffs to be restored to the disputed property in Breckenridge, Colorado will be **DENIED**.

## II.  SUMMARY OF THE DISPUTE

This is a trademark, franchise, and breach of a real estate lease fight between Plaintiffs Spice Merchants Entities Corp., STM Properties, LLC, and Lisa Freeman (collectively "Plaintiffs" or "Freeman") on the one hand, and Defendants Pretty Colorado LLC and Corinne Winslow ("Winslow Defendants" or "Winslow") and Ellis Young (USA) LTD ("Ellis") on the other.

Briefly, Plaintiffs are involved in franchising the Spice & Tea Merchants brand to owners of spice and tea shops. Defendant Pretty Colorado, through owner Corinne Winslow, was a franchisee running a franchised store (the "Store") in downtown Breckenridge which sold tea, spices, and other items. Trevor Ellis (through his entity Ellis Young (USA) LTD) was the landlord who initially had an executed lease with STM Properties (Ms. Freeman's real estate entity) as lessee for the Breckenridge location. Ms. Freeman then subleased the Store property to Winslow under a sublease arrangement. Winslow had originally been a Store employee or manager when Freeman owned and ran the Store, but eventually Winslow transitioned to being the Store owner, as a franchisee of Freeman. The sublease between STM Properties and Winslow expired in March 2022. Plaintiffs represent that STM Properties tendered a new sublease to Winslow that she refused to sign. Nevertheless, it is essentially undisputed that there was a month-to-month sublease arrangement between STM Properties and Winslow and Pretty. The head lease was between Ellis (through his entity Ellis Young) as landlord, and STM Properties as lessee.

This dispute came to a head in February 2022 when Ms. Freeman insisted on payment from Winslow for more than $35,000 in inventory and furnishings that had

3

been transferred to Winslow when Winslow began running the Breckenridge Store as a franchisee. This inventory debt was never formally recorded via a promissory note. Nor was there any formal agreement as to the value of the inventory and furnishings or the schedule to pay for that inventory and furnishings. But it is undisputed that Winslow owed (and still owes) some amount of money for the inventory and furnishings transferred to the Winslow Defendants. It might have been $20,000 and it might have been $39,000, but it was not an insubstantial sum.

After more than a year and half without payment for the inventory, coupled with Winslow's failure to execute a formal promissory note to repay the debt, a frustrated Freeman gave notice to Winslow that she was going to start withdrawing money ($1,500 a month) from Winslow's bank account via automatic fund transfer (an "ACH" or "automated clearing house" transfer). *See generally* Ex. MM (email of November 7, 2023, from Lisa Freeman to Corinne Winslow). Winslow had authorized Freeman to make such automatic collections to satisfy monthly franchise royalty payments pursuant to the franchise agreement. But Winslow had never authorized Freeman to take money automatically to satisfy the claimed inventory/furnishings debt.

Distraught by the use of the automatic fund transfer process for unauthorized purposes, Winslow cancelled the ACH authorization with her bank and insisted that Freeman return the $1,500. Rather than returning the $1,500, Freeman (through her lawyer) said she would allocate that money toward the October 2023 royalty obligation which, based on the Store's sales for that month, would have been $2,259.00. this left Winslow owing $759.24 for the October 2023 royalty payment.

4

Winslow did not reinstate the ACH transfer authorization, which was a requirement of the franchise agreement. Winslow says she was prepared to pay the full October royalty payment if Freeman returned the $1,500 that had been improperly withdrawn. Winslow also says she was willing to negotiate proper documents to reflect the inventory debt, which she recognized that she owed, but she disagreed on the valuation and was not willing to sign the documents that Freeman had prepared, which reportedly had errors. On November 20, 2023, Freeman's lawyer sent a letter to Winslow's counsel listing supposed franchise agreement defaults, including a supposed inventory deposit default, a failure to pay the remaining $759.24 royalty for October 2023, the failure to provide the ACH authorization, breach of an advertising requirement which required a certain expenditure per month, and a failure to provide certain required financial reports. The payment defaults needed to be cured by November 30, 2023, and the other defaults cured by December 20, 2023, or the franchise agreement would be terminated.

This dispute culminated at the end of November 2023 with Freeman coming to Breckenridge, effectively unannounced, to do an inspection of the Store, which she says she was entitled to do under the franchise agreement. Fearful about a confrontation, and with just a few minutes' notice of Freeman's impending arrival, Winslow closed the Store early. Freeman arrived and Ms. Winslow says that she blocked Winslow's car in the parking spot. Freeman demanded entry into the store. Winslow refused. Winslow says that Freeman told her during that confrontation that the franchise was terminated. The Court finds Winslow credible on this point. Freeman, who was subleasing the Store property to Winslow, had law enforcement post notices to quit on the door of the Store.

5

All this was done on November 28 and 29, 2023 -- *before* the deadline specified by Freeman's lawyer to cure the franchise agreement defaults.

But on December 8, 2023, Winslow turned the tables on Freeman. Trevor Ellis terminated the headlease with Freeman's STM Properties. One claimed basis for terminating the headlease was that Freeman did not have a valid sublease with Winslow; instead, the sublease had gone to a month-to-month arrangement. Ellis terminated the headlease without talking to Freeman and without giving any opportunity to cure. The same day that Ellis terminated Freeman's headlease, he signed a new lease with Winslow's company, thereby freezing out Freeman and Spice Merchants.

After closing the Store for two months (December 2023 and January 2024), with a new lease in her own company's name, Winslow reopened the tea and spice shop under a new brand ("Breckenridge Tea and Spice")—printing up her own stickers to cover the "Spice & Tea Merchants" logo on older spice packages. By starting her own tea and spice shop within just months of having her Spice & Tea Merchants franchise terminated, Winslow is arguably in breach of the franchise agreement's non-compete provisions.

Hence, we get Freeman's claim that Winslow has effectively stolen the tea and spice shop franchise. In Freeman's telling, Winslow acquired over $35,000 of inventory and furnishings without paying or executing a promissory note. Winslow got Freeman's training manuals, customer lists, and proprietary recipe and mixing books, which have not been returned. Winslow was trained by Freeman how to run the Store. Winslow has garnered all the goodwill associated with Spice & Tea Merchants brand and is now competing directly in violation of the non-compete provisions of the franchise

agreement. Freeman says that to protect the franchise brand and to protect other franchisees and their investments in the brand, the Court should restore the physical store property to Freeman (presumably by cancelling Ellis's lease to Winslow and restoring the headlease to STM Properties); order Winslow to return all manuals, recipes, and customers lists; and enforce the non-compete provisions of the franchise documents by shutting Winslow down.

Winslow, for her part, argues that it is Freeman who is trying to take unfair advantage. Winslow says that she always paid her royalties on time—until Freeman used the ACH transfer process to try to take money for the inventory where there was never any written agreement to pay for the inventory and there was a dispute about the amount owed for the inventory and furnishings. More significantly, Winslow, through counsel, takes issue with the notion that Freeman has any legitimate protectable interest in the "Spice & Tea Merchants" mark in connection with a spice or tea shop. In a partial motion to dismiss, ECF No. 17, filed April 4, 2024, Winslow makes the argument, repeated in the response brief and at the preliminary injunction hearing, that the Spice & Tea Merchants franchise is effectively based on a fraud—the promise of an enforceable federal trademark for spice and tea shops—when, in fact, the mark is for "on-line retail store services featuring cookware and cooking accessories, namely kitchen and culinary equipment, salt and pepper shakers, kitchen and culinary utensils and accessories, and a wide variety of other cooking accessories; Retail store services featuring cookware and cooking accessories, namely, kitchen and culinary equipment, salt and pepper shakers, kitchen and culinary utensils and accessories, and a wide variety of other cooking accessories." ECF No. 18-1 at 4. Per Winslow, it is unlikely that

7

the United States Patent and Trademark Office ("USPTO") would have granted the federal trademark registration "Spice & Tea Merchants" for a spice and tea shop because it is too generic and descriptive. Yet, the franchise agreement was based on the promise that Freeman was giving Winslow a franchise in a company with a protected and protectable mark for the purpose of selling tea and spices.

### III. STANDARD FOR PRELIMINARY INJUNCTION

A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). The function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties. *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181 (10th Cir. 1975); *Cont'l Oil Co. v. Frontier Refining Co.*, 338 F.2d 780 (10th Cir. 1964). The grant or denial of a preliminary injunction is within the sound discretion of the trial court. *Lundgrin*, 619 F.2d at 63 .

Preliminary injunction is an extraordinary remedy—an exception rather than the rule. *See GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Thus, the right to relief must be clear and unequivocal. *See Penn.*, 528 F.2d at 1185. The burden is on the movant to make a prima facie showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001). The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted). Prevention of harm to the movant is one purpose of a preliminary injunction , *O Centro*

8

*Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004), but it is not the "paramount purpose," which is, instead, "the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id*. (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2947 (2d ed. 1995)).

In determining whether to issue a preliminary injunction, a court is to consider whether the movant has established the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction; if issued, is not adverse to the public interest. *Big O Tires, Inc.*, 167 F. Supp. 2d at 1221–22; *Lundgrin*, 619 F.2d at 63.

The following types of injunctions are disfavored: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief she may recover at the conclusion of a full trial on the merits. *O Centro*, 389 F.3d at 975. Any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. *Id*. Because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id*. at 976, 980.

**IV.   ANALYSIS**

The Court finds that, generally, the Plaintiffs in this case, Freeman and her companies, have failed to meet their burden of proving a clear entitlement to preliminary injunctive relief. Plaintiffs have not shown that the injuries they may have suffered or may suffer cannot be addressed via an award of money damages. Enough questions have been raised about the potential validity of the trademark "Spice & Tea Merchants" that the Court questions the fairness of enforcing a non-compete based on a franchise agreement that includes, as a large part of its consideration, the validity of the "Spice & Tea Merchants" trademark. The Court also finds that the requested preliminary injunction would disrupt and not preserve the status quo. Finally, The Court finds that Freeman has not acted in the most equitable way in relation to this dispute. She terminated the franchise prematurely, before the cure period had even run. The Court credits Winslow's testimony that Freeman appeared at the store, effectively unannounced, and ended up blocking Winslow in the parking, demanding to be allowed into the store. She also had the Sheriff start posting notices to quit on the door of the store before the cure period had expired. "One who seeks equity must do equity." *Cont'l Oil co. v. Osage Oil & Refining Co.*, 57 F.2d 527, 531 (10th Cir. 1932). Freeman did not act equitably in this instance.

This is not to say that Winslow is without fault here. It is apparent from the evidence that she owes something for the inventory. She says that she was going to pay the outstanding October royalty amount, but was insistent on getting her $1,500 back first, which arguably makes little sense.

All that said, given that the franchise has terminated, there is no reason for Winslow or Pretty Colorado to retain any of the proprietary documents or materials that

she was given (or that were in the Store) when she started running the franchise. Winslow does not dispute that she does not own those materials and professes not to use them. The Court finds that Freeman has proven her entitlement to the return of those materials, and Winslow is ordered to return those materials within five (5) days from the date of this Order.

### a. Plaintiffs have not established that a preliminary injunction would preserve, rather than disrupt, the status quo.

Preliminary injunctions that do not simply preserve the parties' position pending trial are particularly disfavored. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.* 916 F.3d 792, 797 (10th Cir. 2019). Disfavored injunctions are ones that mandate action rather than prohibit it, change the status quo, or grant all the relief the movant would be entitled to if victorious at trial. *Id*. The status quo is defined as "the last peaceable uncontested status existing between the parties before the dispute developed . . . ." *Id*. at 798, n.3 (internal citations omitted.)

Here, the "last peaceable uncontested status existing between the parties" was that Winslow was running a tea and spice shop out of the store location in Breckenridge and paying rent directly to Ellis. While Freeman's company, STM Properties, was technically the lessee and held the lease, STM Properties was not even acting as a pass-through; instead, Winslow paid Ellis the rent directly. Winslow had possession of the store property. Although Ellis terminated the lease with Freeman's STM Properties and signed up Winslow's Pretty Colorado as a new tenant, that was arguably merely formalizing the informal situation that existed before—Winslow in possession and paying rent to the landlord, Ellis. Freeman is the one who upset the status quo by terminating the franchise agreement and trying to evict Winslow. Therefore, the relief

11

sought in this case would not preserve the status quo pending a decision on the merits; it would upset it.

Similarly, the status quo at the time this lawsuit was filed was that Winslow was running a spice and tea shop in downtown Breckenridge. Enforcing the non-compete provision of the franchise agreement by evicting Winslow would upset that status quo and eliminate the prospect of any tea of spices being sold in the near future from a specialty shop in Breckenridge. Evicting Winslow and enforcing the non-compete would effectively give Freeman all the relief to which she would be entitled after a full trial on the merits—which is another form of disfavored injunction.

### b. Plaintiffs have not clearly established irreparable harm.

"[A] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004) (quotation and alteration omitted). "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003). In other words, one only gets a preliminary injunction when an award of money after the fact cannot cure the injury.

Here, it should not be overlooked that this legal fight arose because of a dispute over money. Freeman was upset that Winslow had not paid for the inventory and furnishings that she had acquired when she began running the store. Winslow also refused to sign (or failed to sign) a promissory note that would assure she would start making payments on that debt. There is a dispute about the value of those furnishings,

whether it was in the range of $20,000 or closer to $40,000.[1] But Winslow does not dispute that she owes something for that inventory. However, there is also no dispute that there was no written agreement or schedule pursuant to which that money should be paid back. The matter came to a head when the frustrated Freeman withdrew from Winslow's account $1,500 in funds using the ACH process. This withdrawal was not authorized. Winslow then cancelled the ACH authorization. Freeman refused to return the $1,500, instead deciding to attribute that to the unpaid royalties that she could not get via the ACH process. Ultimately, it appears that Freeman terminated the franchise because of a dispute over $759.24 in unpaid royalties.

It is not clear that Winslow's failure to pay for the inventory would, of itself, have been a basis for terminating the franchise, as opposed to simply a basis for a breach of contract suit or an unjust enrichment claim. The Court finds unconvincing the other articulated bases for terminating the franchise (found in a letter from counsel dated November 20, 2023, Ex. 24), such as default of the inventory deposit of $20,000 (which appeared to have been waived for Winslow), the default of payment due for inventory (discussed above), the default of advertising requirement, or the default of reporting.

In any event, what Freeman has lost to date is either the ongoing royalty payments that she would have received had Ms. Winslow had continued as a franchisee, or, with the franchise terminated, the loss the royalties Freeman would have gotten had she found a replacement franchisee and had Winslow, abiding by the non-compete agreement, stopped selling spice and tea. Presumably, Winslow's profits

---

[1] Freeman submitted an inventory valuation dated January 6, 2022 which she says she compiled at the time the Store was transferred to Winslow, which shows $39,144.94 in product and furnishings. *See* Ex. 9

13

during the time she was purportedly in violation of the non-compete can be calculated and would be at least one of the measures of Freeman's damages. Freeman has also lost, and is presumably entitled to recover, the value of the inventory and furnishings. But these amounts can be calculated.

In protesting Ellis's termination of the headlease, Freeman wrote that she found it "staggering" that he had terminated the lease and effectively turned the Store over to Winslow, without regard to the investment Freeman had made in the Store (including furnishings) and 14 years of "hard work." Freeman stated to Ellis, "this loss represents nearly $100,000 to me." Thus, Freeman could at least put some dollar amount on the loss caused by Ellis's allegedly unlawful termination of the headlease.

There is also the issue of the lost goodwill of the Spice & Tea Merchants brand that had been built up over the years at the Breckenridge store. But there was little evidence presented of any goodwill associated with the Store itself. The Court does not find that Winslow is inappropriately capitalizing on the "Spice & Tea Merchants" trademark. She has changed the signage and covered up with stickers the old Spice & Tea Merchants labels that were found on her existing inventory, which arguably minimizes any damage to the Spice & Tea Merchant brand. The Court finds unpersuasive the claim that Winslow is somehow infringing on Spice & Tea Merchant's trade dress.

In sum, the Court is not convinced that the damages suffered by Freeman and her companies are so incalculable as to justify the imposition of an injunction. The Court comes to this conclusion without making any determination or finding whether Ellis's termination of the headlease was valid or not. After all, Ellis himself terminated the

14

headlease without giving any right to cure or speaking to Freeman, and one of the basis given for termination—that there was no valid sublease with Winslow--is suspect, since Ellis turned around and signed his own lease with Winslow. Obviously, Ellis had no problem with Winslow as a tenant.

### c. The balancing of the equities does not favor an injunction.

Plaintiffs argue that the "only harm to Pretty [Colorado] and Winslow is that they must relocate their competing store outside the non-competition zone." ECF No. 8 at 10. Of course, the non-competition zone is 15-miles from Breckridge—essentially Summit County—and Winslow would have to move her store to Vail or Steamboat Springs or Fairplay to not be in violation. Plaintiffs also argue that every day that Pretty Colorado and Winslow are allowed to operate as an independent store, the goodwill built up by the Spice Merchants franchise system in Breckenridge since 2009 is dissipating. *Id*.

The Court is unconvinced that the damage to goodwill is incalculable, and there was scant evidence presented of "goodwill" that was being dissipated by the continued operation of Winslow's shop. Plaintiffs also argue that there is the possibility that "left unchecked," other Spice Merchants franchisees will do the same thing that Winslow has done—learn the "Spice system," amass goodwill under Spice Merchant's system, and then stop paying royalties and "convert to an independent retailer once their franchise rights terminate." *Id*. The Court finds this potential harm to be speculative. This was a unique situation.

The Court recognizes that there is caselaw expressing the view that where there is a non-competition agreement, breach is the "controlling factor" and injunctive relief follows "almost as a matter of course." *I Can't Believe IT's Yogurt v. Gunn,* No. 94-OK-

15

2109-TL, 1997 WL 599391, at *20 (D. Colo. April 15, 1997) (quoting *Miller v. Kendall*, 541 P.2d 126, 127 (Colo. App. 1975), for proposition that "[w]here there is a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course. Damage is presumed to be irreparable and the remedy at law is considered inadequate"). But here, the issue of the breach, at least on the question of the royalty payment, is unclear. Freeman arguably first violated the terms of the agreement by making an unauthorized ACH transfer and then terminated the franchise before the time to cure had passed. The Court concludes that, based on the preliminary injunction evidence, Freeman is not without fault. Communication was still going-on between the lawyers. The relatively small overdue royalty payment could have been paid quickly. Freeman's appearance at the store, her confronting and blocking-in of Winslow, and her having the Sheriff prematurely post notices to quit on the store unnecessarily escalated the situation. Thus, a multi-year relationship apparently collapsed over little less than an $800 royalty payment.

The Court's conclusion that Freeman unnecessarily escalated and accelerated the collapse of the business relationship is supported by an exhibit submitted by Defendants (Ex. OO) which contains intemperate language by Freeman directed at another former friend and business partner whom Freeman also was accusing of having stolen her ideas, recipes, and business plan.

The damage to Winslow of enforcing the non-compete pending a full trial on the merits would be substantial. By all accounts, this business is not raking in substantial profits. It would not be easy for Winslow to pull up stakes and move to a new location 15 miles from Breckridge. There may be some damage to the goodwill of the Spice & Tea

Merchants franchise if Winslow is permitted to continue to operate a spice shop in Breckenridge during the pendency of this case. But there was little evidence about the real degree of that damage. In sum, the Court does not find that the balancing of the equities justifies the issuance of a preliminary injunction here.

### d. Winslow should return any manuals, guides, and recipes.

The Court does find that Freeman has sufficiently proven her case for the return of any operations manual, instruction guides, or recipes that Winslow received from Freeman when Winslow became a franchisee. Winslow testified that she is still in possession of that documentation, although she claims not to use it. The franchise agreement has been terminated and there is no basis for Winslow to retain possession of arguably proprietary materials that she received from Freeman or Spice & Tea Merchants. Therefore, Winslow shall return any such documentation to Ms. Freeman within five (5) days from the date of this Order.

## V.   CONCLUSION

For the reasons outlined above, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction, ECF No. 8, is **GRANTED IN PART** and **DENIED IN PART** as follows.

Winslow and Pretty Colorado are **ORDERED** to return any Spice & Tea Merchants documents, manuals, operating guides, or recipes that Winslow received (or retained possession of) when she became a franchisee of Freeman or Spice Merchants Entities within five (5) business days from the date of this Order. The Motion is **DENIED** in all other respects.

It is further **ORDERED** that the Parties are to contact the Court's chambers (303-335-2403) within three (3) days to schedule a telephonic scheduling conference so as to obtain a scheduling order, and get trial dates.

**SO ORDERED**

Dated:   September 24, 2024
　　　　 Denver, Colorado

N. Reid. Neureiter
United States Magistrate Judge