IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00371-NRN

SPICE MERCHANTS ENTITIES CORP., a Michigan corporation,
STM Properties, LLC, a Michigan limited liability company, and
LISA FREEMAN, a Michigan individual,

Plaintiffs,

v.

PRETTY COLORADO, LLC, a Colorado limited liability company,
CORINE WINSLOW, a Colorado individual, and
ELLIS YOUNG (USA), LTD, a Colorado limited liability company,

Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT (ECF No. 82)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

The Parties have consented to the jurisdiction of this magistrate judge for all purposes and Judge Regina M. Rodriguez issued an Order of Reference on May 6, 2024. ECF. No. 29.

This matter comes before the Court on Defendant Pretty Colorado LLC ("Pretty"), Corine Winslow ("Winslow"), and Ellis Young (USA), Ltd.'s ("Ellis") (collectively, "Defendants") Partial Motion for Summary Judgment, filed on January 28, 2025. ECF No. 82. Plaintiffs Spice Merchants Entities Corp. ("Spice"), STM Properties, LLC ("STM"), and Lisa Freeman ("Freeman") (collectively, "Plaintiffs") opposed the motion on February 19, 2025. ECF No. 83. Defendants filed a reply on March 4, 2025. ECF No. 85.

The Court heard argument on the subject motion on March 19, 2025, ECF No. 92, and has taken judicial notice of the docket and considered the applicable Federal Rules of Civil Procedure and case law. Now being fully informed and for the reasons discussed below, it is hereby **ORDERED** that the subject motion, ECF No. 82, is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND[1]

Plaintiffs are franchisors of the Spice & Tea Merchants brand. Winslow, through Pretty, was a franchisee running a store in downtown Breckenridge, Colorado that sold tea, spices, and other items (the "Store"). Winslow now operates the Store independently under the name Breckenridge Tea & Spice. Ellis owns the building where the Store is located. Winslow currently rents the Store location from Ellis.

Plaintiffs assert numerous claims against Defendants. At issue here are Plaintiffs' trademark infringement and unfair competition claims brought under provisions of the Lanham Act, 15 U.S.C. §§ 1114 & 1125, against Winslow and Pretty, and Plaintiffs' breach of contract claim against Ellis.

In their federal trademark infringement claim, Plaintiffs allege that the "Breckenridge Tea & Spice" mark being used by Pretty and Winslow is likely to cause confusion as to the source and origin of the goods being sold under that mark, inducing purchasers to believe that the goods are somehow connected to Freeman and Spice.

---

[1] The Court detailed the nature and factual background of this lawsuit in its Order on Plaintiff's Motion for Preliminary Injunction, ECF No. 67, and Order Denying Defendants' Partial Motion to Dismiss, ECF No. 77, and will not repeat it here except as necessary.

In their claim for unfair competition under 15 U.S.C. § 1125(a), Plaintiffs further allege that Winslow and Pretty are using the same trade dress as the Spice franchises, which creates a likelihood of confusion among consumers as to the source of their competing products.

Finally, Plaintiffs claim that Ellis is liable for breach of contract because it terminated STM's lease to the Store location without providing an opportunity to cure.

Defendants move for summary judgment on these claims.

## II. MATERIAL FACTS

The following recitation of facts relevant to the subject motion is drawn from the materials submitted in the summary judgment briefing.[2] The Court views all the facts in the light most favorable to Plaintiffs as the non-moving parties.

### a. Trademark Infringement and Unfair Competition

Freeman has a registered trademark, Serial No. 86878430 ("Mark 430"), for the plain words "SPICE & TEA MERCHANTS". Mark 430 is for "[o]n-line retail store services" "featuring cookware and cooking accessories, namely, kitchen and culinary equipment, salt and pepper shakers, kitchen and culinary utensils and accessories, and a wide variety of other cooking accessories."

Plaintiffs claim that Mark 430 is incontestable pursuant to 15 U.S.C § 1065. Defendants, on the other hand, contend that Mark 430 was obtained by fraud. They state that Freeman has a "cancelled" and "dead" trademark, Serial No. 78819491 ("Mark 491"), for the plain words "Spice Merchants". According to Defendants, Mark 491

---

[2] Pursuant to the undersigned's practice standards, the parties filed a Separate Statement of Facts, in the form of a table and supported by evidence in the record, which the Court primarily relies upon. *See* ECF No. 85 at 2–20.

3

was originally rejected by the United States Patent and Trademark Office ("USPTO") as "generic" and "merely descriptive" because the description Freeman provided to the USPTO was that the mark was for "retail store services featuring fragrances, herbs, flavorings." Mark 491 was ultimately approved by the USPTO after the description was changed to "[r]etail store services featuring cookware and cooking accessories, namely, kitchen and culinary equipment, salt and pepper shakers, kitchen and culinary utensils and accessories, and a wide variety of other cooking accessories."

Mark 491 was cancelled as of June 21, 2019. Plaintiffs say they did not renew it because the business changed names. Defendants maintain that Freeman failed to submit the required proof that she was using Mark 491 for the cookware services under which the mark was registered because "[s]he intended to bypass previous failed efforts to register under spices and herbs." In other words, "[t]o get approval for the Spice & Tea Merchants trademark, [Freeman] registered the Mark under cookware and cooking accessories, which demonstrates Plaintiffs' efforts to obtain the Mark through fraud."

Defendants also note that Mark 430 has a disclaimer that states, "No claim is made to the exclusive right to use 'MERCHANTS' apart from the mark as shown." Defendants insist that this explicit limitation "demonstrates the commonness of the words [Freeman] purports are protected and the precariousness of the trademark claim."

Defendants further state that there is a disclaimer added to the trademark for "Spice and Tea Exchange", a mark evidently associated with Freeman's ex-husband's business, which provides that "[n]o claim is made to the exclusive right to use '**SPICE & TEA**' apart from the Mark as shown." According to Defendants, this shows that Plaintiffs

4

do not have an unfettered right to use the words "spice" and "tea" outside of the specific trademark that includes those words.

Defendants argue that the goods sold by Breckenridge Tea & Spice—"teas, sea salts, sugars, syrups, jams & jellies, dried soups, cornbread and pancake mix, margarita mix, peppercorns, tea accessories, incense & incense burners, candles, rock candy, tea/coffee stirrers, tea sugar cubes, pre-packaged cookies and mixes, and tote bags"—are not the same products as the "cookware and cooking accessories" Plaintiffs purport to offer at their Spice locations. Plaintiffs point out the Store sells other goods like "gift boxes, hardgoods, wooden honey dippers, infusers, mugs, tuffy infusers and salt and pepper grinders, tumblers, utensils, mortars and pestles, salad tongs, kitchen containers and storage bins and tea pots." Plaintiffs, for their part, further argue that spices and teas themselves should be considered "cooking accessories."

### b. Breach of Lease

Trevor Ellis, through Ellis Young (USA), Ltd., is the owner and landlord of the building in Breckenridge where the Store is located. In 2017, Ellis and STM (Freeman's real estate entity) executed a lease (referred to as the "Head Lease") for the location. Freeman then subleased the Store property to Winslow under a sublease arrangement beginning in January 2022.[3] The sublease between STM and Winslow expired in March 2022, which resulted in a month-to-month sublease arrangement between STM and Winslow.

---

[3] Winslow had originally been a manager when Freeman owned and ran the Store, but she eventually transitioned to being the Store owner, as a franchisee of Freeman.

5

In late November 2023, Freeman and Winslow had a verbal altercation in the Store's parking lot when Freeman, who lived in Michigan but was in Breckenridge at the time, demanded access to the store. Freeman threatened to begin eviction proceedings, and had a Notice to Quit posted soon thereafter.

Hearing reports of this incident, Ellis terminated the Head Lease with STM in December 2023, and then executed a new lease with Winslow and Pretty. Plaintiffs claim that the Head Lease was terminated because "Winslow duped Ellis into believing Freeman did something improper." Defendants counter that Ellis terminated STM's lease "for various reasons, including, but not limited to, not getting approval for a sublease that began in January 2022, because no valid sublease existed after March 31, 2022, and because Pretty Colorado and Ms. Winslow did not meet the insurance requirements."

## III. LEGAL STANDARD

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

The moving party bears the initial responsibility of providing the court with the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Unsupported and/or conclusory allegations do not establish an issue of fact sufficient to defeat summary judgment. *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005); *see also McVay v. W. Plains Serv. Corp.,* 823 F.2d 1395, 1398 (10th Cir. 1987); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

"The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52 (1986). However, "[i]f a party fails to . . . properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

## IV. ANALYSIS

### a. Trademark Infringement and Unfair Competition[4]

The Lanham Act prohibits the unauthorized use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). It also imposes civil liability for "uses in commerce" of any "name [or] symbol" "in connection with any goods or services" that are "likely to cause confusion." *Id.* § 1125(a)(1).

---

[4] "Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together . . . ." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1050 (10th Cir. 2008); *see also RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2019 WL 6052416, at *5 (D. Colo. Nov. 15, 2019) ("Courts addressing claims of both trademark infringement and unfair competition address the claims together because they have virtually identical elements . . . .")(citation omitted)). The Court will therefore discuss these claims at the same time.

The parties disagree on what elements must be met for Plaintiffs to succeed on their trademark infringement and unfair competition claims. As the Court noted at the motion to dismiss stage, to state a claim for infringement of a registered trademark under § 1114, the plaintiff must establish that "(1) the mark is validly registered; (2) defendants' use of the mark was unauthorized; and (3) defendants' use is likely to cause confusion in the market place concerning the source or quality of the products." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1222 (D. Colo. 2001) (citing *Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 948 (D. Colo. 1988)). Defendants, on the other hand, recite the standard for infringement of an unregistered trademark under § 1125(a), which requires the plaintiff to show (1) it has a protectable interest in the trademark; (2) the defendant is using an identical or similar trademark in commerce; and (3) the defendant has confused consumers by its use of the similar or identical mark. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013). Regardless, because "[t]he central question in a typical infringement action under either [test] is whether the defendant's use of the plaintiff's mark is likely to cause consumer confusion," *id.*, and because Plaintiff asserts claims under both provisions of the Lanham Act, the Court will focus on this third element.

"Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir. 1987) (quoting with approval *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 564 (1987) (Brennan, J., dissenting))). In the Tenth Circuit, "likelihood of confusion is a question of fact but one amenable to summary judgment in appropriate cases." *Sally

9

*Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). An appropriate case is one in which there is no genuine dispute as to the facts material to the likelihood of confusion. *See id.*

To determine whether two non-identical marks are likely to cause confusion, the Tenth Circuit directs the Court to examine six non-exhaustive factors: (1) the degree of similarity between the competing marks; (2) the intent of the alleged infringer in adopting the contested mark; (3) evidence of actual confusion; (4) the similarity of the parties' products and the manner in which the parties market them; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the strength of the contesting mark. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). The importance of any particular factor in a specific case "can depend on a variety of circumstances, including the force of another factor." *Id*. "These [six] factors are interrelated and no one factor is dispositive." *Sally Beauty*, 304 F.3d at 972. Depending upon the facts and circumstances of a given case, some factors may have more relevance than others. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998).

> For example, a small degree of similarity between two marks may lead to a finding that confusion is likely when the products are identical, inexpensive items. On the other hand, very similar marks may not generate confusion as to the source of the products where the products are very different or relatively expensive.

*Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986). The key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks. *Water Pik*, 726 F.3d at 1143. A lower degree of similarity can still cause

confusion when the marks are placed on closely related goods. *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2004).

Applying the Tenth Circuit's six factor test for likelihood of confusion by consumers, the Court finds as follows.

### i. The degree of similarity between the marks

The Court assesses the "degree of similarity between marks on three levels: sight, sound, and meaning." *Big O Tires*, 167 F. Supp. 2d at 1223; *see also Beer Nuts*, 805 F.2d at 925 (listing "appearance," "pronunciation of the words used," "verbal translation of the pictures or designs involved," and "suggestion" as the appropriate factors when assessing the degree of similarity between marks). These factors are "examine[d] . . . 'in the context of the marks as a whole as they are encountered by consumers in the marketplace.'" *Big O Tires*, 167 F. Supp. 2d at 1223 (quoting *Beer Nuts*, 805 F.2d at 925). The Court "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark." *Sally Beauty*, 304 F.3d at 972. "In so doing, similarities are weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner." *Id.*

"Spice & Tea Merchants" and "Breckenridge Tea & Spice" both contain the words "spice" and "tea," which stands to reason given that both are stores that sell primarily these products. However, "[m]arks must be considered as a whole." *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014). The Court "is not free to give dispositive weight to any one component of the marks, such as a shared syllable." *Id.* Nor can the Court "'focus solely on name similarity." *Id.* (quoting *Heartsprings,* 143 F.3d

at 555. Instead, the Court "must consider the effect of marketplace presentation, including 'lettering styles, logos and coloring schemes.'" *Id.* (quoting *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994)).

As to the sounds factor, although Plaintiffs urge the Court to ignore the word "Merchants" in Mark 430 because Freeman disclaimed it, the Tenth Circuit has instructed that marks should be compared "in their entirety, including disclaimed words within the mark." *Id.* (citing *Universal Money Ctrs.,* 22 F.3d at 1531). Therefore, the Court disagrees that the relevant comparison is between "spice & tea" versus "tea & spice." Plainly, Spice & Tea Merchants and Breckenridge Tea & Spice do not sound at all the same when said aloud.

They also do not have the same meaning. The latter mark indicates that spices and tea are sold in one place, Breckenridge. Plaintiffs maintain that geographic terms do not distinguish otherwise distinctive and similar marks. The Court might be persuaded if Winslow and Pretty were operating a store called "Breckenridge Spice and Tea Merchants" or "Tea and Spice Merchants of Breckenridge," but Winslow and Pretty do not use the word "Merchants." *Cf. Int'l 29 Club of Chicago, Inc. v. Mighty Start, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988) (preliminary injunction granted to trademark holder when marks were "International Kennel Club of Chicago" and "International Kennel Club").

The Court also finds that the sight factor weighs in favor of Defendants. The Court has compared the logos and fonts used on the packaging of the two businesses and finds that they are not similar such that the consumers would be confused if they

encountered them in the marketplace. The Court finds that the two marks are distinct and there is little likelihood of confusion based on the similarity of the marks.

### ii. The intent of the alleged infringer in adopting its mark

Given that the marks at issue are not similar, the Court finds that there can be no inference that Pretty and Winslow deliberately attempted, through the use of the mark, to "pass off" their products as Plaintiffs'. Thus, the Court does not find that that Winslow and Pretty "adopted [their] mark for the purpose of deriving benefit from a plaintiff's existing mark." *Heartsprings*, 143 F.3d at 556; *see also Beer Nuts, Inc.*, 805 F.2d at 927 (analyzing factors giving rise to inference of intent). Accordingly, this factor does not weigh in favor of finding a likelihood of confusion. It is true that Winslow and Pretty are operating the Store in the same location as the previously franchised operation and selling substantially the same goods—spices and teas. But the Court must focus on the confusion purportedly generated by the adoption of an allegedly similar trademark. On this subject, the Court cannot find that there was any intent by Defendants, in adopting the new mark, to pass off their operation as being associated with the previously franchised store.

### iii. Strength or weakness of the plaintiff's mark

To determine the relative strength of a plaintiff's trademark, the mark must be placed in one of five categories of increasing distinctiveness and strength: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Heartsprings*, 143 F.3d at 555.

> A generic term is a term used to describe the relevant type or class of goods. It is the weakest mark. A descriptive term describes a characteristic of a product or service. The third, and stronger, mark is a suggestive mark, which suggests rather than describes a characteristic of the product and

13

>requires the consumer to use imagination and perception to determine the product's nature. And finally, an arbitrary or fanciful mark is the strongest mark. An arbitrary mark has a common meaning unrelated to the product for which it was assigned, while a fanciful mark signifies nothing but the product.

*Id.* (quoting *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 654–55 (10th Cir. 1996)). As the Court noted in its previous order, Mark 430—"Spice & Tea Merchants"—is a weak, descriptive mark for a store that sells spice and tea, barely stronger than "Bagel Shop" would be for a bakery selling bagels, or "Furniture Store" would be for a furniture seller. This finding is bolstered by Defendants' reference to the thousands of third-party marks containing the terms "tea" and "spice" that can be found on the Principal Register of the USPTO. This factor weighs strongly in Defendants' favor.

### iv. Evidence of actual confusion, if any

To be relevant, such evidence should demonstrate actual confusion among consumers within the marketplace. *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991). Plaintiffs cite evidence from the Preliminary Injunction Hearing that an unidentified customer in 2024 bought a packet of tea at Breckenridge Tea & Spice that Spice did not carry and then visited a Spice store in Marquette, Michigan looking for that type of tea. The Tenth Circuit has "consistently recognized . . . that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis" because "[w]hat is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion." *Water Pik*, 726 F.3d at 1150–51. While customer inquiry evidence may be admissible and relevant, "standing alone with no other evidence it is

14

insufficient proof of actual confusion." *Jordache*, 828 F.2d at 1487 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 23:2(B), at 54 (2d ed. 1984)); *see also Universal Money Ctrs.*, 22 F.3d at 1535 (isolated instances of actual confusion are *de minimis* and insufficient to establish a genuine issue of material fact); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.02[2][b], at 29 (3d ed. 1992) ("Evidence of actual confusion of a very limited scope may be dismissed as de minimis: 'Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification.'") (quoting *McGraw–Hill Pub. Co. v. Am. Aviation Assocs., Inc.*, 117 F.2d 293, 295 (D.C. Cir. 1940)). This one isolated incident "has minimal probative value on whether reasonable consumers as a whole are actually confused by" the "Breckenridge Tea & Spice" trademark as somehow being affiliated with the Plaintiffs' Spice & Tea Merchants franchise. *Water Pik*, 726 F.3d at 1151. This factor favors Defendants.

### v. Similarities and differences of the parties' goods, services, and marketing strategies

Breckenridge Tea & Spice offers "teas, sea salts, sugars, syrups, jams & jellies, dried soups, cornbread and pancake mix, margarita mix, peppercorns, tea accessories, incense & incense burners, candles, rock candy tea/coffee stirrers, tea sugar cubes, pre-packages cookies and mixes, and tote bags." Defendants point out that this is different from what Mark 430 is registered for: a retail store offering "cookware and cooking accessories."

Plaintiffs insist that they sell the same products as Winslow and Pretty, which, as a matter of fact, appears to be the case. However, it is undisputed that the protections associated with the registered Mark 430 are for "retail store services featuring cookware

15

and cooking accessories . . . namely kitchen and culinary equipment . . . and a wide variety of other cooking accessories." This description is only tenuously related to a specialty shop that primarily sells tea and spices. Although both businesses sell some items that could be considered "kitchen equipment," the Court is wholly unpersuaded by Plaintiffs' argument that spices and teas themselves can be considered "cooking accessories." In short, the Court agrees with Defendants that Mark 430 is registered for a cookware and kitchen equipment store, not a spice and tea store.[5] While Plaintiffs may actually sell teas and spices (just like the Defendants), the mark which they claim is being infringed is registered for retail store services featuring "kitchen" and "culinary equipment." The Court is not inclined to allow a party to register a mark with the U.S. Patent and Trademark Office for one stated purpose (retail store for kitchen and culinary equipment), while seeking advantage in this litigation by claiming to do something different -- selling teas and spices. If anything, this factor weighs in favor of Defendants. In addition, even if the Court were to accept that Defendants and Plaintiffs are selling precisely the same items, it would not be enough to lead to a likelihood of confusion, given the differences between the two marks.

---

[5] Defendants make the argument that Mark 430 is not protectable at all because it is not being used for the cookware and cooking accessories for which it was registered. Indeed, Defendants claim that Plaintiffs never intended to sell such items but only used that description after their previous attempt to register the mark under "spices, herbs, and flavorings" was rejected. The Court does not need to reach this issue because it finds, even assuming Mark 430 is valid and entitled to protection, that there was no likelihood of confusion between Defendants' use of the "Breckenridge Tea & Spice" mark and the "Spice & Tea Merchants" mark.

> **vi. The degree of care likely to be exercised by purchasers of the goods or services involved**

There is little evidence as to the degree of care exercised by purchasers in selecting between the parties' products. The Court credits Plaintiffs' argument that buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse, like teas and spices. *See Sally Beauty*, 304 F.3d at 975. This factor weighs in Plaintiffs' favor.

However, considering all the relevant factors, especially the lack of similarity between the marks and the paucity of evidence of actual confusion, the Court does not find, as a matter of law and undisputed fact, any likelihood of confusion.

### b. Trade Dress Infringement

The trade dress of a product is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992). As noted above, the Lanham Act prohibits the use in commerce of any word, name, symbol, or combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, that "is likely to confuse, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." other person." 15 U.S.C. § 1125(a)(1)(A). Protection may extend to a single feature or a combination of features in a trade dress. *See Vornado Air Circulation Sys., Inc. v. Duracraft Corp.,* 58 F.3d 1498, 1502 (10th Cir. 1995). "In order to demonstrate trade dress infringement for product packaging, the plaintiff must demonstrate (1) that its

17

trade dress is inherently distinctive or has become distinctive through secondary meaning; and (2) likelihood of confusion. *Sally Beauty*, 304 F.3d at 977. "In addition, the party asserting trade dress infringement bears the burden of demonstrating that the trade dress is not functional." *Id.*

The Court finds no disputed factual issues that would justify a trial on the question of trade dress infringement. There is evidence that both stores use wood furniture, wood and glass items, and fabric decorations in the presentation of their products and their store layouts. But the Court is unpersuaded that the Plaintiffs have presented sufficient evidence to demonstrate that Spice's trade dress is sufficiently unique and inherently distinctive that it merits protection. *See Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 2012–13 (2000). (Distinctive trade dress "almost *automatically* tell[s] a customer that they refer to a brand and immediately signal a brand or a product source."). Instead, Defendants have offered evidence that the trade dress described is commonly used in tea and spice stores around the country, including the independent tea and spice store that predated Spice at the Breckenridge location. Moreover, Plaintiffs have not offered any evidence that trade dress has acquired any secondary meaning beyond Freeman's conclusory opinion.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Lanham Act claims.

### c. Breach of Contract

Defendants argue that the breach of contract claim against Ellis fails because STM sublet the property to Pretty and Winslow without Ellis's prior written consent, in violation of the Head Lease. When Ellis learned in late 2023 that no valid, written

sublease existed, it legally terminated the lease with STM. According to Defendants, "[t]his is not a breach of contract by Ellis, but rather a clear and uncurable breach of the lease by Plaintiffs."

The Court will not grant summary judgment on this claim. There is a genuine issue of material fact whether Ellis was aware that Winslow/Pretty were subleasing the property from STM in 2022 and whether Ellis approved this arrangement. Specifically, there is evidence that Ellis accepted rent payments directly from Pretty beginning in April 2022. Moreover, the fact that Ellis immediately entered into a new lease with Winslow/Pretty after it terminated the Head Lease with STM raises the possible implication that Ellis's stated reasons for terminating the Head Lease were pretextual. As the Court emphasized at the motion to dismiss stage, Defendants' argument that STM's supposed breaches of the Head Lease could not have been cured, thereby justifying the termination without the opportunity to cure, is "mere assertion":

> To the extent STM was in violation for not having a written sublease, the violation could have been cured by getting Pretty/Winslow to sign a written agreement. To the extent that STM was in violation for having a sublessee without the express written approval of [Ellis], STM was arguably curing that problem by evicting Pretty/Winslow from the leased premises. It also beggars belief that [Ellis] terminated the Head Lease because [Ellis] had never approved Pretty/Winslow as a subtenant when [Ellis] then immediately turned around and leased the premises to Pretty.

ECF No. 77 at 13. This remains the case and precludes summary judgment.

## V. Conclusion

For the foregoing reasons, Defendants' Partial Motion for Summary Judgment, ECF No. 82, is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Claims One and Two are **DISMISSED**.

Date: April 23, 2025

_____
N. Reid Neureiter
United States Magistrate Judge